# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA | : **TO BE FILED UNDER SEAL** |
| | : |
| | : Mag. No. 16-6546 |
| v. | : |
| | : |
| CARY LEE PETERSON | : **CRIMINAL COMPLAINT** |
| | : |

I, Jeffrey R. Clark, being duly sworn, state the following is true and correct to the best of my knowledge and belief.

### SEE ATTACHMENT A

I further state that I am a Special Agent with the Federal Bureau of Investigation and that this Complaint is based on the following facts:

### SEE ATTACHMENT B

continued on the attached page and made a part hereof.

_____
Jeffrey R. Clark, Special Agent
Federal Bureau of Investigation

Sworn to before me and subscribed in my presence,
March 10, 2016 at Newark, New Jersey

HONORABLE JOSEPH A. DICKSON                  _____
UNITED STATES MAGISTRATE JUDGE                     Signature of Judicial Officer

**ATTACHMENT A**

**COUNT ONE**
**(False Certification)**

On or about December 21, 2012, in Monmouth County, in the District of New Jersey, and elsewhere, the defendant,

CARY LEE PETERSON,

being the Chief Executive Officer of RVPlus, Inc. ("RVPlus"), an issuer with the U.S. Securities and Exchange Commission, did knowingly certify falsely that RVPlus's Form 10-Q for the quarter that ended October 31, 2012 filed with the Securities and Exchange Commission fully complied with the requirements of Sections 13(a) and 15(d) of the Securities Exchange Act of 1934, and that the information contained in the October 31, 2012 Form 10-Q fairly presented, in all material respects, the financial condition and results of operations of RVPlus, knowing that RVPlus's Form 10-Q for the quarter that ended October 31, 2012 did not comport with the requirements of the Securities Exchange Act of 1934 and did not fairly present, in all material respects, the financial condition and results of operations of RVPlus, in that PETERSON falsely certified that RVPlus was owed approximately $8,653,846 in short-term accounts receivable.

In violation of Title 18, United States Code, Section 1350.

**COUNT TWO**
**(False Certification)**

On or about March 28, 2013, in Monmouth County, in the District of New Jersey, and elsewhere, the defendant,

CARY LEE PETERSON,

being the Chief Executive Officer of RVPlus, Inc. ("RVPlus"), an issuer with the U.S. Securities and Exchange Commission, did knowingly certify falsely that RVPlus's Form 10-Q for the quarter that ended January 31, 2013 filed with the Securities and Exchange Commission fully complied with the requirements of Sections 13(a) and 15(d) of the Securities Exchange Act of 1934, and that the information contained in the January 31, 2013 Form 10-Q fairly presented, in all material respects, the financial condition and results of operations of RVPlus, knowing that RVPlus's Form 10-Q for the quarter that ended January 31, 2013 did not comport with the requirements of the Securities Exchange Act of 1934 and did not fairly present, in all material respects, the financial condition and results of operations of RVPlus, in that PETERSON falsely certified that RVPlus was owed approximately $17,590,837 in short-term accounts receivable.

In violation of Title 18, United States Code, Section 1350.

### **COUNT THREE**
### **(Securities Fraud)**

From in or about May 2012 through in or about March 2013, in Monmouth County, in the District of New Jersey, and elsewhere, the defendant,

CARY LEE PETERSON,

by use of the means and instrumentalities of interstate commerce, the mails, and facilities of national securities exchanges, directly and indirectly, knowingly and willfully used manipulative and deceptive devices and contrivances in contravention of Section 10(b) of the Securities Exchange Act of 1934, in connection with the purchases and sales of securities, to wit, shares of RVPlus by (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon other persons.

In violation of Title 15, United States Code, Section 78j(b) and Title 17, Code of Federal Regulations, Section 240.10b-5.

## **FORFEITURE ALLEGATIONS**

1. As the result of committing the offenses constituting specified unlawful activity as defined in 18 U.S.C. § 1956(c)(7), as charged in Counts One through Three of this Complaint, defendant CARY LEE PETERSON, shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the said securities fraud offenses, and all property traceable to such property.

2. If any of the property described above, as a result of any act or omission of the defendants:

   a. cannot be located upon the exercise of due diligence;

   b. has been transferred or sold to, or deposited with, a third party;

   c. has been placed beyond the jurisdiction of the court;

   d. has been substantially diminished in value; or

   e. has been commingled with other property which cannot be divided without difficulty,

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c), to seek forfeiture of any other property of the defendants up to the value of the above forfeitable property.

## ATTACHMENT B

I, Jeffrey R. Clark, am a Special Agent with the Federal Bureau of Investigation. I have conducted an investigation and discussed this matter with other law enforcement officers who have participated in this investigation, and have knowledge of the following facts. Because this affidavit is being submitted for the limited purpose of establishing probable cause, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts which I believe are necessary to establish probable cause. Unless specifically indicated, all dates, times, and monetary amounts described in this affidavit are approximate, and all conversations and statements described in this affidavit are related in substance and in part.

1. At all times relevant to this complaint:

   a. Defendant Cary Lee Peterson ("PETERSON") was the Chief Executive Officer of RVPlus, Inc. ("RVPlus") and also held other positions with RVPlus.

   b. RVPlus was organized as a corporation under the laws of the state of Delaware, and listed Jersey City, New Jersey as its corporate headquarters. RVPlus purported to be a developer, manufacturer, and marketer of products related to the recreational vehicle industry.

   c. RVPlus's common stock traded publicly on the Over-the-Counter Pink Sheets market, under the symbol RVPlus, until on or about July 19, 2013, when the Securities and Exchange Commission ("SEC") suspended trading in RVPlus.

   d. Federal securities laws required public companies to file periodic reports with the SEC, including Form 10-K, Form 10-Q, and Form 8-K (the "SEC Reports"). SEC Form 10-K was an annual report that provided a comprehensive summary of a public company's financial performance. Forms 10-K were required to include, among other pieces of information, audited financial statements. SEC Forms 10-Q, which included unaudited financial statements and provided a continuing view of the company's financial position during the year, had to be filed with the SEC for each of the first three fiscal quarters of the company's fiscal year. Public companies were required to file SEC Forms 8-K on a current basis any time a significant corporate event occurs.

    e. A company's accounts receivable was the balance of money owed to a company by a customer for products and/or services rendered.

    f. Defendant PETERSON and RVPlus were required to comply with the federal securities laws, including the requirement that RVPlus file SEC Reports that accurately presented RVPlus's financial condition and the results of its business operations. As RVPlus's Chief Executive Officer, defendant PETERSON was responsible for certifying the accuracy of the RVPlus Reports.

    g. The U.N. Department of Economic and Social Council (the "U.N. Department") provided "consultative status" to certain non-governmental organizations ("NGOs"). This status provided NGOs with access to not only the U.N. Department (through the U.N. Department's NGO Branch), but also, among other things, the U.N.'s many subsidiary bodies and special events organized by the President of the General Assembly.

### False and Misleading RVPlus SEC Filings

2. In violation of his obligations, from in or about December 2012 through in or about March 2013, defendant PETERSON filed various SEC Reports on behalf of RVPlus that were materially false and misleading (the "False RVPlus Reports").

3. The False RVPlus Reports were false and misleading primarily because they inflated RVPlus's accounts receivable.

4. For example, on or about August 21, 2012, RVPlus filed a report on Form 8-K with the SEC, which defendant PETERSON signed in his capacity as CEO of RVPlus (the "August 21 8-K"). In the August 21 8-K, defendant PETERSON certified that RVPlus had entered into a contract worth approximately $1.8 billion with the "Ministry of Environment for Katsina State Within the Federal Republic of Nigeria" to provide unspecified green energy products and services (the "Nigeria Agreement").

5. In truth and in fact, the Nigeria Agreement created no actual payment obligation on the part of the Nigerian Ministry or any other governmental entity. Instead, the Nigeria Agreement purportedly assigned the payment obligation to a third party called the "United World Charitable Fund, A Beneficiary to the Charles Schwab Charitable Fund" (the "United World Charitable Fund").

6.  An individual named Amir Rafrouf Kalifah ("Kalifah") purportedly signed the Nigeria Agreement on behalf of the United World Charitable Fund. Law enforcement has been unable to uncover any records showing that either the United World Charitable Fund or Kalifah actually exist.

7.  As another example, on or about November 16, 2012, RVPlus filed a report with the SEC on Form 8-K, which defendant PETERSON signed (the "November 16 8-K"). In the November 16 8-K, defendant PETERSON certified that RVPlus had entered into a contract worth approximately $90 million with the "Commission of the Foreign Affairs to the Senate for the Republic of Haiti" (the "Haiti Agreement"). As with the Nigeria Agreement, the Haiti Agreement purportedly assigned the payment obligation to the United World Charitable Fund, and was signed by Kalifah.

8.  On or about December 17, 2012, defendant PETERSON sent an email enclosing information related to RVPlus's Form 10-Q for the quarter ending October 31, 2012 to Individual 1, an accountant responsible for auditing RVPlus. On or about December 18, 2012, Individual 1 emailed defendant PETERSON and advised defendant PETERSON that RVPlus could not include anticipated revenues from the Nigeria Agreement in its Form 10-Q because RVPlus could not demonstrate that "delivery has occurred or services have been rendered" under the Nigeria Agreement. Defendant PETERSON replied to Individual 1: "You and I know goods not deliver [sic] and contract just start."

9.  On or about December 18, 2012, after the email exchange described in paragraph 8, Individual 2—the managing partner of RVPlus's accounting firm responsible for RVPlus's audit—sent defendant PETERSON a letter advising defendant PETERSON that the accounting firm was terminating its relationship with RVPlus. Individual 2 explained that "[d]uring our discussions to perform the quarterly reviews ended October 21, 2012, it became apparent that the books and records of [RVPlus's] revenue would not meet our requirements to obtain sufficient and appropriate evidence, especially in the area of revenue recognition."

10. The investigation has not revealed any goods or services provided by RVPlus, or any payments actually received by RVPlus, under the Nigeria Agreement.

11. Nevertheless, on or about December 21, 2012—despite the warning from the accounting firm—RVPlus filed a quarterly report with the SEC on Form 10-Q for the quarter that ended October 31, 2012, which falsely stated that RVPlus held approximately $8,653,846 in short-term accounts receivable for services rendered under the Nigeria Agreement (the "October 2012 10-Q"). Defendant PETERSON, acting as RVPlus's CEO and principal financial officer, signed and certified the October 2012 10-Q.

12. On or about December 27, 2012, RVPlus filed a Form 8-K, which Defendant PETERSON signed in his capacity as the CEO of RVPlus (the "December 27 8-K"). In the December 27 8-K, defendant PETERSON certified that RVPlus had entered into a contract worth approximately $10.5 million with the Federal Ministry of Planning & Economic Affairs for the Republic of Liberia (the "Liberia Agreement"). As with the Nigeria Agreement and the Haiti Agreement, the Liberia Agreement purportedly assigned the payment obligation to the United World Charitable Fund, and was signed by Kalifah.

13. The investigation has not revealed any goods or services provided by RVPlus, or any payments actually received by RVPlus, under either the Haiti Agreement or the Liberia Agreement.

14. Nevertheless, on or about March 28, 2013, RVPlus filed a quarterly report with the SEC on Form 10-Q for the quarter that ended on January 31, 2013, which falsely stated that RVPlus held approximately $17,590,837 in short-term accounts receivable from, among other sources, the Haiti Agreement and the Liberia Agreement (the "January 2013 10-Q"). Defendant PETERSON, acting as RVPlus's CEO and principal financial officer, signed and certified the January 2013 10-Q.

15. On or about July 19, 2013, the SEC suspended trading in RVPlus due to questions concerning, among other things, the accuracy of RVPlus's periodic financial filings, including reported accounts receivable, assets and operations.

### Other False Statements Regarding RVPlus's Contracts with Various Governments and Governmental Organizations

16. As the U.N. Department makes clear, U.N. Department consultative status does not accrue any financial advantage to the respective NGO, nor does it create any financial relationship between the respective NGO and the United Nations. Furthermore, the U.N. Department does not provide funding or financial support of any kind to any organization with which it partners.

17. On or about September 3, 2010, defendant PETERSON formed ECCO2 Corp. ("ECCO2"), a not-for-profit Texas corporation that defendant PETERSON wholly owned. By at least early November 2010, ECCO2's website claimed that it was an "affiliate organization" of the United Nations Climate Convention.

18.   On or about November 5, 2010, the chief legal advisor to the U.N. Climate Convention sent defendant PETERSON a cease-and-desist letter. The letter stated, in part:

> It has come to our attention that ECCO2 Corp claims in the news section on its internet page to be an 'affiliate organization of the United Nations Framework Convention on Climate Change': http://www.ecco2corp.org/news.html>. This information has been reproduced by several online publications on the basis of your claims and statements. Since ECCO2 Corp is not in fact affiliated with the [U.N. Climate Convention] or the secretariat of the [U.N. Climate Convention] in any way, we demand that you immediately cease and desist from making any such statements and claims and that you notify all the concerned online publications that you have no such affiliation.

19.   The investigation has not revealed any actual consultative or financial relationship between ECCO2 and the U.N. Department, or that ECCO2 was ever an affiliate of the U.N. Climate Convention.

20.   On or about May 4, 2012—when defendant PETERSON purchased the control block of RVPlus shares—ECCO2 licensed certain intellectual property to RVPlus, including "the exclusive rights and authority to all active and pending business partnerships, affiliations, joint ventures, which also include any letter of intent [and] letter of understanding."

21.   On or about May 4, 2012, ECCO2 issued a press release stating that ECCO2 had "completed its acquisition with" RVPlus (the "May 4 Press Release"). The May 4 Press Release appeared on ECCO2's website and contained a quote from defendant PETERSON as RVPlus's "President-CEO." The May 4 Press Release falsely claimed that ECCO2 was "recently admitted" to the U.N., that ECCO2 was an "affiliate partner" of the U.N. Climate Convention, and that "[t]his status held with the sectors of the United Nations opens many windows of opportunity to over $100 billion in financial aid to fund ECCO2 projects."

22.   On or about May 31, 2012, ECCO2 issued another press release and claimed that RVPlus had "recently acquired" ECCO2 (the "May 31 Press Release"). The May 31 Press Release appeared on ECCO2's website and contained a quote from defendant PETERSON as RVPlus's "CEO-Chairman." The May 31 Press Release repeated the May 4 Press Release's false statements about ECCO2's relationship with the U.N.

23.   On or about June 29, 2012, ECCO2 issued a press release stating that RVPlus had "recently acquired" ECCO2 (the "June 29 Press Release"). The

June 29 Press Release appeared on ECCO2's website and referenced a radio interview with defendant PETERSON, RVPlus's "Chairman-CEO." The June 29 Press Release repeated the May 4 and May 31 Press Releases' false statements about ECCO2's relationship with the U.N.

24. On or about August 21, 2012, RVPlus issued a press release that appeared on ECCO2's website and quoted defendant PETERSON as RVPlus's "Chairman-CEO" (the "August 21 Press Release"). The August 21 Press Release falsely stated that RVPlus had entered into the ten-year Nigeria Agreement "for a total of $1.8 billion (USD)."

25. On or about October 10, 2012, defendant PETERSON, using the alias "dick_schmidt," posted on a message board related to RVPlus on InvestorsHub.com, a financial markets website. Defendant PETERSON stated that, among other things, the value of the Nigerian Agreement made RVPlus stock worth "over $10 a share 1:1. Even only counting first year's contract revenue it should be over $2 a share. Way under valued [sic]." In another posting on InvestorsHub.com, defendant PETERSON, again using the alias "dick_schmidt," defended the statements in various SEC filings stating "Fed filings don't lie" and advised other shareholders: "I would buy up as much as possible." In addition, on or about July 24, 2013, defendant PETERSON, using the alias "dick_schmidt," posted on InvestorsHub.com:

> 8K Contracts are extremely valid. Each 8K contract was with a federal government agency. Each party in contract is either a affiliate [sic] of UN or some Ministry or something or office of Foreign affairs.... If they contracts [sic] were bogus the CEO would have detained the CEO or whoever was responsible for faking something this extreme.... Let's use our common sense here.

26. On or about November 16, 2012, RVPlus issued a press release that appeared on ECCO2's website and contained a quote from defendant PETERSON as RVPlus's "CEO-Chairman" (the "November 16 Press Release"). The November 16 Press Release falsely stated that RVPlus had "entered into a material agreement for $90 million" to supply "green technologies chains that enable the environment, agriculture, climate change, and economy in the Republic of Haiti over the next decade."

27. On or about December 27, 2012, RVPlus issued a press release that appeared on ECCO2's website and stated that RVPlus had "entered and reported a $10.5 million material agreement," referring to the Liberian Agreement.

28. On or about February 11, 2013, RVPlus issued a press release stating that ECCO2 was a "UN affiliate partner" (the "February 11 Press Release"). The February 11 Press Release appeared on ECCO2's website and

provided defendant PETERSON's opinion, as RVPlus's "CEO-Chairman," on ECCO2's business.

29. On or about July 24, 2013, defendant PETERSON received an e-mail from the U.N. Climate Convention which stated:

> [W]e would like to bring to your attention the misuse of the [U.N. Climate Convention] logo and making erroneous statement about your observer status with the [U.N. Climate Convention].... In this context, we would like to remind you that you were already demanded by the [U.N. Climate Convention] secretariat to immediately cease and desist from making similar statements and to notify the secretariat of the removal of the logo. The letter was sent to you on November 5, 2010.